Good afternoon. I see Mr. Smith is already at the podium here, or Mr. Abrams is here at the podium on behalf of Mr. Smith and Mr. Johnson is here for the state of Alabama. Are you ready to proceed, counsel? Yes, we are, Your Honor. You may proceed. May it please the Court, counsel, Hugh Abrams on behalf of the appellant Willie Smith. I will address the 2254 D.2 issues on the intellectual disability claim, but I'd like to start with the Batson issue in light of this Court's grant of the Certificate of Appealability on Batson. As the Court knows, the prosecutor at trial used 14 of his 15 strikes to eliminate women from the jury panel. The Alabama Court of Criminal Appeals and the District Court both agreed that Smith has satisfied prongs 1 and 2 of JEB and Batson. There's a prima facie case of discrimination that shifts the burden of proof to the prosecutor. But here, if one looks at the Court of Criminal Appeals opinion, one sees that the trial court essentially vouched for the prosecutor, saying, well, I've known this man for a long time. He's not one who's prone to strike minorities. When the question is, as Judge Cobb pointed out on the Court of Appeals in Alabama, that women are not minorities, and he was striking women. A single discriminatory strike supports a finding of the JEB Batson violation. Mr. Abrams, I have a question. It's not exactly what you're talking about, but if you'll indulge me. So I noticed that the Alabama courts and Judge Proctor and the District Court both found that there was nobody on the veneery named Johnson. But I found a Criminal Jury Week for May 4, 1992, list of jurors, and it has two people named Johnson on it. Clarence Johnson and Donnell Johnson. I couldn't make sense of that. Can you help me? I believe that's the veneer, or if it has to be pronounced in other words, that's the listing of all the folks who came in to potentially be on the jury. In terms of actual jurors and strikes, there was no one named Johnson. But just, this was something, it was obviously, it was an error in transcription by the court reporter. But what's interesting is, I mean, it's a reasonable error given the victim's name was Johnson, and they were talking about one of the witnesses was going to be the victim's brother, who was a police officer, was going to be a witness. And so, but what's interesting here is the District Court concluded, as a matter of fact, that there was a person on the jury. We don't know his name, but it was a male, concluded it was a male juror, and that, who was a member of a church board. And the prosecutor's only reasons for strikes here for the women was, well, they're involved in church activities. They have some sort of volunteer in church activity. There was no detailed voir dire of these people to say, well, fine, you're in a church activity, but what are your religious beliefs? What's really going on here? And I think the fact that the District Court has concluded, even though the name is Johnson, we all know is erroneous, the District Court concluded that there was a juror not struck by the prosecution, who was on the church board. And when you do the Miller L2 side-by-side comparison, four women strikes, the prosecutor says, oh, all because of church activities, male ends up on the jury, member of the church board. To what extent do you think it's relevant that, or not relevant, that women are not ended up on the jury? Your Honor, I would contend that it is not relevant, although the District Court did look to that. It's not relevant at all? I mean, I'm not saying conclusive, but it's not relevant at all? No, I disagree. I mean, there is, obviously, you look at a lot of factors, and the fact that there were women on the jury, I think, is a factor here. But ultimately, Batson is talking about the particular strikes. And here, where you have a... No, no doubt, but you're also trying to figure out, with the whole mosaic of evidence, whether or not the prosecution improperly struck jurors based on something that is illegitimate or improper. And the fact that some women remained on the jury, the District Court thought and the Alabama Court of Criminal Appeals thought was at least important. I think it's a factor that can be considered, but I think what weighs against it is here you have 14 or 15 strikes by the prosecution or women. The prosecutor ran out of strikes, so he had to end up with some women on the jury. Do we know from the record, I haven't looked this deep, do we know whether or not those women were seated because the prosecution ran out of strikes? Or were they seated before while the prosecution was exercising strikes? I think the way... That seems to me to be important. If it turns out that women sat on the jury, but maybe only because the prosecution ran out of peremptories and couldn't strike more women, that might be telling. On the other hand, if women were being seated without the prosecution trying to exercise strikes and then struck women off and on, that might be different, at least a little bit different. I think the way the process worked here was the jurors were all put into the box and there were a number of people. So you had male, female, black, white, and one Latino woman. And they were all in there. And then the judge said, okay, defense, prosecution, tell me your strikes. And so defense said, I strike juror this number. Then prosecution, I strike this number. Defense, this number. And they went back and forth one after the other. And so you're eliminating people from that. And of the 15, you have the prosecution using 14. And it's not just the four, you know, we have these four women, which are talking about the prosecutor after the fact says, well, they volunteered. This was in response to a defense question. Did all 14 of the women who were stricken say that notwithstanding my religious views, I can consider this case fairly and impartially and not allow my religious views to interfere with my decision? There was no, no, Your Honor, because there was no further voir dire by the prosecutor. I mean, had the prosecutor followed up, and I think this point is made in one of the cases, had the prosecutor followed up and said, ah, Mrs. X, you are a volunteer at the church. But the questions were asked by the defense attorney and not by the prosecutor, right? Correct. There was one question by the defense attorney. And that question was, it was a sort of a catch-all. He said, has anyone served as a volunteer, coaching, church, supervisory type situation, maybe Sunday school teacher, things of that nature. And this is what prompted these. You also have juror number 99, Mr. Hall, ultimately a defense strike, didn't make it on to the juror. He was a YMCA football coach. And the district court said, well, this is an analogous to a volunteer at a church. And I would say, well, wait a minute. Both are, it's a volunteer being a coach at a Christian organization, Young Men Christian Association. And the prosecutor never asked any questions of him or others about their religious beliefs. And that's what Judge Cobb mentioned in her dissent in the Court of Appeals, that there was no voir dire on the juror's religious beliefs. How much, how much significance should we attribute to the fact that this judge said on the record, look, I know this prosecutor. He tries a lot of cases in my courtroom. He's not the kind of guy that strikes based on gender or religious views. I'm familiar with him. I know him. I've looked at these jurors. Some of them were inattentive. There are some other reasons why they could have been stricken. How does that factor into our analysis? I don't think it should factor in at all because the cases in Miller, I'll talk about the comparison based on what happened at the trial, based on what the prosecutor was doing, not the judge coming in and vouching for the prosecutor here. And second, I believe, I don't want to misstate, but I believe that his statements related to the fact that the prosecutor was black. And he said, well, I know this man would not strike minorities. He wasn't talking about women and the strikes of the women at that point. And in addition, you've got another two, you've got Juror Ramos, who was struck because she was, quote, single and very, very young. Well, three single male jurors, 219 Rodham, 194 Presnell, and number 10 Barrett, all made it onto the jury. And there's no indication that the prosecutor knew Ramos's age. When he said she was very, very young, the only evidence we have in the record is that, oh, she was a student at the University of Alabama, Birmingham. But the prosecutor asked no questions of the male jurors or anyone about age. That's just not in the record at all. Going back to Judge Wilson's question, you know, you have, let's think of a different scenario. You have a trial judge who sees lawyers day in and day out for a number of years. That judge forms impressions, correctly or incorrectly, about the veracity, the trustworthiness of lawyers who appear regularly before him or her. And they decide instinctively whether or not they can take something at face value or whether they've got to dig deeper and see what's really going on. You're suggesting that can't be done or was not done in the appropriate way here? Well, it was not done in the appropriate way here. I think it's appropriate for a judge to comment on his relationship and his understanding of people and the prosecutor. But here, he's making this, he's essentially vouching for this journey. And it's on the question of gender, not the question of race. And similarly, we've got Perry, number 192. She was struck because she was inattentive. Even though the transcript, if you go back to the transcript, there's a Mr. Gunther, number 93, who was considered to be almost asleep. And Perry's not even discussed by the district court, although she is mentioned in the first remand. And I think what's critical here is when you have a 10 to 2 jury vote in favor of capital, in favor of the death penalty, that is the minimum number of jurors necessary under Alabama law in order to allow the judge to implement the death penalty. So a Batson violation or a JEB violation is a structural error. And here, it has a tremendous amount of significance. I know you want to get to the Atkins issue, but just before we leave this, you understand there's a substantial amount of deference that is afforded to the trial judge in determining whether or not, I think the state even admits that the first two elements of Batson are met. But in terms of the persuasiveness of the reason given by the state for striking the jury, there's a lot of deference that's afforded to the trial judge. And just before you get to the next issue, how do you get around that standard, the deference that we have to give the trial judge in determining that the reasons given were race neutral? I think the way you get around it is with the Mr. Johnson, where you have the district court judge concluding that there was a juror on the panel, male, who was a member of his family. And so it just strikes in the face of what the prosecutor is saying. Now, had the district court come out differently or the trial judge come out differently on that, but that's a finding that the district court made. It seems to me under D-2. So there's no difference between Mr. Johnson and the 14 women who were stricken? My point is when you compare Johnson to the four women who were stricken supposedly because they were volunteers at a church, that the prosecutor left Mr. Johnson or whoever that was on the panel. I think we got your argument there. Why don't you talk about the Atkins claim now. So things are different now as a result of the Supreme Court's opinion in Shoup v. Hill now. We can't say in the 11th Circuit now, based on Shoup v. Hill, that Moore v. Texas can be applied retroactively, can we? Especially since two other circuits have said no, the 6th and I believe it's the 6th and the 8th. Well, I think that, well, the Supreme Court, I believe in Shoup, was saying that under D-1 that Moore was not in effect at the time. And we concede that Moore was not in effect at the time. But it was remanded for consideration under D-2. Our argument under, I think Moore, what Moore says is, and is helpful to us, is that the standard has changed because now you have to look at the medical condition. You know, it's the medical standards one needs to look at. So I believe this Court can find that it's retroactive based on that. But I would focus the Court's attention on the intellectual disability on two undisputed facts which we believe give us relief under D-2. One undisputed fact is that the Alabama courts found that Mr. Smith scored 64 on a properly administered IQ test that was administered by Dr. Selekin. There is no dispute. The local court, the Rule 32 court said that he found Dr. Selekin credible, that she was capable of doing the IQ tests. But inexplicably what the court decided was it's not going to consider 64. It's only going to look at Dr. King's .72 because, well, that had a verbal portion which was consistent with the one other test that was a verbal portion given 20 years earlier. Alabama says that the court did not disregard the 64 IQ score but just resolved it against conflicting testimony by Dr. Blotke and Dr. King. It's not, Your Honor, my point would be this. You're talking about data points. If I were here to take the temperature of this room and you said that you find me credible, that I know how to take temperature, which is what they found with Dr. Selekin, and you say that I have a thermometer that works, in other words, there's a, you know, that we have a test that works, and I give you the temperature reading, you have to consider it. I mean, you can't just toss that out as a matter of data. If you decide that I'm in. Yeah, but I think Alabama says in its brief that it wasn't disregarded, that the court considered it, but just resolved it against the other IQ scores. That's my point, is that if one is considering data, you can't just rule it out. You average it or alternatively, the way you harmonize it. You have to average it in order to consider it? Well, or you look at standard error measurement. Standard error measurement allows you to harmonize. Let's go back to your... I'm not sure that your example was a good one. If you're taking the temperature of this room, and you and your colleague are using the same machine to take the temperature of the room, and you tell us the temperature is 68, and he says the temperature is 72, but it turns out that he or you used the measurement in one location in this courtroom, and the other one used it in three locations, isn't there a way to Even though you were both using the same measurement, the same machine, the same calibration, and to say, well, maybe where you took it, it was 68, but where he took it, he took it in three different places, and it was 72. And so, although I'm considering the 68, it seems to me 72 is the better reading of the temperature. But I think in that case, Your Honor, what you're saying is I don't know what I'm doing in taking the temperature. I'm taking it in just one location and... I'm not sure what you're doing, but I'm trying to analogize it to the test that rendered a 60-something score for your client, and that was not a complete test, right? No, it was a complete test. Dr. Selleckin gave him a 60, it was a complete test, and here you have the finding by the... I thought you had said that it was missing part of the verbal component. This was one of the tests that was given earlier by Dr. Blocky, where he came up with a 75 for the verbal. And what the local court said was, well, Blocky's 75 matches with the 75 verbal that Dr. King had, so therefore, I find that to be more reliable. And my point is, had the local court said, Dr. Selleckin is not credible, Dr. Selleckin doesn't know what she's doing, there's something wrong with her test, it can't come out to 64, that would be one thing. But that's not what they said. They said, well, she's credible, everyone agreed. Dr. King, on cross-examination, I asked him, do you have any problems with Dr. Selleckin's test? He said, no, looks good to me. So in other words, there wasn't a situation where Dr. King says, Dr. Selleckin's taking the temperature over there in the corner, she needs to come here in the middle. And so you have a situation, you have this fact that it seems to me that you can't disregard that fact. I understand the argument. The hard part about that for you, though, is that your expert, Dr. Selleckin, said your client's not intellectually disabled, didn't she? Well, yes, Dr. Selleckin ultimately said that based on, she'd given him a number of different tests, and some tests he did fairly well on. And she said, well, looking at all this, I find that he's not mentally retarded. Our answer to that is, is that at bottom, what the Atkins-Perkins test is, it's a three-prong test, we have to hit below 70. And our argument is on prong one, that with the 64, if you average it, or if you consider standard error measurement, if you give some credence to that in some way, it moves Dr. King's number down below 70, and we meet the first prong. Only by disregarding it, as the state contends should be done here, does one avoid the average, and one avoids 70. So you cannot be mentally retarded, but still be intellectually disabled within the meaning of the Perkins test. That's the argument that you're making, right? That is our position, Your Honor, yes. Because there's a difference between a medical conclusion and a legal conclusion, right? Exactly. And when you get to the adaptive deficits, what happened is the local court, the Rule 32 court said, and Dr. King and Dr. Sullivan all said, looking at tests, this man has deficit, is impaired in a number of different areas, and found that. But Dr. Sullivan and Dr. King, the two medical experts, neither one of them went and looked at the trial transcript, which is what the Rule 32 court did. What the Rule 32 court did was say, well, okay, I agree, there are deficits here, as shown based on testing, but I'm going to look at the trial transcript, because in there, I can cherry pick information that says, oh, Smith was planning this, and he therefore has adaptive strengths. So what's your strongest argument with regard to that next prong of Perkins, deficits and adaptive behavior? We would say that because we have a... We have a finding by the Alabama court that, and by the two experts, that based on test data, that there are adaptive deficits, and that he needs the Perkins test and more than two. And so Alabama says, but overall, since there was evidence of an ability to cover up a crime from finding no deficits in adaptive behavior. So what do you have to say about that? I would say... Let's look at the facts of that argument. Because I want Alabama to respond to that as well. Let's look at the facts of this argument. This was not a planned crime. Smith had his picture taken, didn't realize that it's in the transcript. There's a finding that he did not realize that when you use an ATM card, because the transcript also shows he never had one, that one is videotaped. He's shown videotaped for four minutes, and he's wearing distinctive clothing. He's wearing an NFL, one of these jackets that has a Raiders name on it. So this isn't someone who's covered his face when he's doing this. And then his cover-up attempt was he said, oh, I went to burn the car to get rid of the fingerprints. Somehow, to me, that's just not... That contrasts dramatically from the Stallworth case and the Perkins case, where in those cases, neither one of those cases says you look at adaptive strengths, but they just say, by the way, Perkins was married for 10 years. Stallworth had a job as a stonemason. Smith never had a full-time job. Smith had part-time... He lived at home, was never married, doesn't have a driver's license. I mean, we're talking about someone here who is truly intellectually disabled. Now, the question is, obviously, do we hit low enough on the legal test? And we think we do. And I think that what Moore, I think, tells us is that no longer are we going to look just at the heart, you know, significantly disabled, but we're... We can't rely on Moore. Right. Well, I think that, Your Honor, the medical standards look at now... Because the medical standards say we don't look at adaptive strengths, we only look at adaptive deficits, regardless of whether we rely on Moore. I think what Moore is saying is that there are these... That you don't look to strengths. That's not the way the medical community operates. And here, the trial judge, the Rule 32 judge, we think went off the rails when he decided to do that. It's the only way he could avoid that finding. He had test finding, test data saying, wow, this guy is disabled, but I need to go elsewhere in order to get for them. Your Honor, I see I've used up my initial time. If there are no further questions, I'll reserve for rebuttal. All right. Thank you, Mr. Abrams. We'll hear from Mr. Johnson on behalf of the state. May it please the court. My name is Henry Johnson. I represent the state. Sticking real quick with the Atkins claim, I just have to correct a few of my friend's points. No expert in this case, not Dr. Karen Salekin, not Dr. Glenn King, the state's expert, found that he had sufficient limitations in adaptive functioning, which is the test under Alabama law. Actually, significant limitations. Karen Salekin, Dr. Karen Salekin, did find that he had a 64 IQ, but she found that he's not intellectually disabled in large part because of her testing about adaptive functioning. I thought she said that he's not mentally retarded. That was the term at the time, Your Honor. This was back in 2008 and 2009. And as the U.S. Supreme Court said, mental retardation and intellectual disability described the same phenomenon that's in Brumfield versus Kane. And so it's always been the state's understanding that they've described the same thing. But the key point of Dr. Salekin is she administered the Woodcock-Johnson achievement test. And she came up with scores, all of which were in the high school or college level. I'll just give you a couple quick examples. Math calculation at 11.0 grade level. Basic writing skills at 9.8 grade level. Academic skills, 10.5. Math fluency, 12.9. Spelling blows the roof off at 13.9, meaning he was spelling as a college freshman. And Dr. King administered the WRAP-IV, the wide range achievement test. Can I ask you a question about Dr. King's test? So the record that I see says that the, I'll just call it the Weschler-III test, gave Mr. Smith a verbal score of 75, a nonverbal score of 74, but a full scale score of 72. How does that work? That's interesting. And I'm not a psychologist. And doing these Atkins cases, I wish I was. Apparently, you average them together somehow. I don't know. And that comes out below both of them? It can. But... Well, thank you for clearing that up for me. But it can do that. But also, one more thing to clarify my friend's position. Mr. Smith had a job for two continuous years. And he was not living, I mean, he was living at home, but he gave his mother his paycheck, again, continuous for two years, and said, take whatever you need out of this paycheck and then give whatever's left to me so I can buy cigarettes and whatnot with it. And then he lost that job because he got into drugs and alcohol, got over that and obtained another job. So his record of adaptive functioning is rather stellar. Let me tell you the concern that I have with the decision by the Alabama courts. And I think Alabama even admits that he showed evidence of adaptive deficits. He did. Well, why didn't the, why doesn't the analysis stop there? And what the Alabama courts did is then it's, it weighed strengths against deficits and, you know, concluded that the fact that he was able to cover up his crime outweighed those adaptive deficits, which completely disregards the adaptive deficits. So I don't understand how the Alabama courts can say it's going to follow medical community clinical standards, say it's going to follow, and then not follow them in this case. And they didn't follow them in this case. And so why shouldn't we, why shouldn't we remand this case back so that the district court or the, or the, or the trial court can take into consideration those adaptive deficits, which Alabama admits were established without coming to an overall conclusion. You can't just say he's got adaptive deficits and that's our standard and then just disregard it. But I would respectfully disagree with your honor. The question is, does he have significant limitations in adaptive functioning? And the Alabama courts said no. Well, I'm on Judge Wilson's side on that. Reading from the Rule 32 order, the court says, in this court's opinion, it talks about the, you know, intentional killing, his apparently well thought out attempts to cover up the crime, ways against the petitioner in relation to his adaptive functioning requirement. I mean, that's exactly what Moore says you can't do, right? And that's exactly what Shoup says this court can't do by looking at Moore. Well, setting that aside, I mean, just, I'll accept for you that, I mean, today with you that Moore doesn't apply here. But I mean, assume that the Rule 32 court was deciding this today. They couldn't do that, could they? I mean, that would be error for them to do exactly what they did a year. I think in a sense, it could be considered error. But the problem is that under edpedeference, the court has to look at what was the clearly established federal law at the time. And that clearly established federal law, as Shoup says, what was on the book was Atkins. But you're just going back to Moore doesn't apply. I mean, I'm talking about, you know, for if this was decided today and Moore did apply, that would be error. I have to struggle with that, Your Honor, because if you look at what Dr. Salekin said, I mean, she was characterizing her own adaptive functioning test, which would not only the Woodcock-Johnson, which I've already discussed, but also the SBAR, the Scales of Independent Behavior Revised, which she administered to his brother and to his mother. And she came out with... Well, but I know, but I'm not talking about what she said. I'm talking about what the Rule 32 court said. Right, but the Rule 32 court was going off of what she and Dr. King had found with their and found that they didn't find that those tests rose to the level of significant limitations. I understand what she said, but I think you and I agree that what the Rule 32 court did in this case, they could no longer do in the future. Talking about how a well thought out attempt to cover up weighs against his deficits in adaptive functioning. You're speaking in terms of whether you could weigh adaptive functioning benefit, adaptive strengths versus adaptive weaknesses. Yeah, and counting the cover up of the crime as an adaptive strength. I mean, clearly the Supreme Court said you can't do that. Well, I'm not entirely sure I agree fully with you, Your Honor, but I think it's neither here nor there in this case, because again, we have all clinicians saying that he's not intellectually disabled. Well, let's set aside Moore versus Texas, but it's not applied retroactively. It's out of the equation. Alabama acknowledges, before Moore versus Texas, it acknowledges that deficits in adaptive functioning can support a claim of intellectual disability consistent with medical standards, right? Well, I have to refer this court to Ferguson. Ferguson says to be diagnosed as mentally retarded, an offender must have significant limitations in adaptive functioning. So some deficits or some difficulties is not enough under Alabama law. It has to be significant limitations. If the record supports significant limitations and then Alabama fails to follow that standard, why isn't that an unreasonable application of Atkins? You cannot set your standards and then not follow them, can you? I guess, Your Honor, with respect, I just disagree with your premise. I would submit that the courts here didn't find that there were significant limitations and then ignore the finding. They didn't find that there were significant limitations. I mean, as the Court of Criminal Appeals, pardon me for quoting very briefly, the Court of Criminal Appeals found the greater weight of the evidence indicates that although he suffers some mental deficiencies, so some, they did not rise to the level at which an impartial mind would conclude from the evidence he was mentally retarded. Because there was evidence that he attempted to cover up his crime? And there was evidence that he worked for two years and gave his mother his paycheck. And there was evidence that all of the clinicians thought he was not mentally retarded. The problem is the Alabama courts did not say that. They didn't say that. I'm reading the Court of Criminal Appeals decision and it didn't, you're saying that, but they didn't say that. So, I'm trying to find some clear findings of fact that would support what you're telling me. I apologize, Your Honor, that they didn't say what? That they didn't, okay. Well, they didn't say that there are no deficits in adaptive behavior because he supported his mother and he protected, you know, he protected his mother when the dad was beating his mother and all the other things that you're relying upon. Well, they did, taking it part by part, they did look, for example, at Dr. Marson, who was another one of Smith's expert witnesses. Dr. Marson did the neuropsychological examination. He didn't do an intellectual examination and he didn't have an opinion, one way or the other, as to whether Smith is intellectually disabled or not. But Dr. Marson indicated that Smith's deficits would cause him, quote, some difficulty in following instructions and retaining information, so as to cause him some shortcomings as it relates to school or work activities. I guess the problem that I have is that when I go to the 112 of the Southern Reporter, the Alabama Court of Criminal Appeals decision, I don't have all of these clear findings that would support the fact that there's no overall deficit in adaptive behavior, other than the fact that he attempted to cover up his crime. And that he did work for two years and made money and gave it to his mother. If there are no more questions on Atkins, I'd be happy to move on to Jeb and Batson, if that would be appropriate. First of all, the district court, in evaluating this claim, found that, of course, the state had, you know, the prongs one and two had been met, of course. But found, just as an observation, that the prima facie case was weak. And it did that for several reasons, three reasons, in fact. First, five women and seven men served on the jury. But if your colleague is correct about the way jurors were struck, that may mean nothing. It does in this circuit, Your Honor. There's a case, Lee versus Klish. I know, but I understand. That's why I was asking him whether it matters who sat on the jury. And I think it does matter. I think it is relevant. But how the jury selection process takes place determines whether or not that's relevant. In other words, imagine a scenario where the first 15 people in the box are women. Certainly. Okay. Certainly. And the prosecution exercises every single peremptory strike against a woman. The first 15 women are gone. The next 12 who stand up, right, are six women and six men. So six women sit on the jury. But that level of strike doesn't tell you anything about motivation or discriminatory intent because it was just a matter of happenstance and chance that women ultimately got to sit on the jury. So my question to you is the same as it was to your colleague. How did the jury selection in this case take place? What was the method of striking? The method of striking, that's crucial here, Your Honor. It was each side had 14 or 15 strikes, rather, and they just gave off a number and they went back and forth. There was nobody in the box. There was, I mean, it was 67, 142, 155, 84, and so on and so forth. And how many were in the box? The entire, all, I was trying to do the math myself, but I believe there were 42 people in general, all the whole venere members. And like, then it doesn't, then it doesn't tell you much. Because if you're striking all the women and you run out of strikes and some women happen to sit, it doesn't tell you you were being benevolent. Well, it tells you something when the defense was striking all the men, so. Except that we don't have a Batson, a reverse Batson claim here by the state because the state won a trial and presumably you don't want a retrial of Mr. Smith. That's correct, Your Honor. Right. But that's another factor that makes it weak, though. In the case I was going to say. Why does that make it weak? How can striking 14, for the prima facie purposes, I understand that with regards to the ultimate determination of discriminatory intent, that's a factual finding and you get AEDPA deference on top of that. But on the prima facie case, how can striking 14 out of 15 women constitute a weak prima facie case? I'd like to, I'd like to know that. The district court found that just by looking at this court's precedent. And I'd like you to explain why that's correct. Well, I can cite one case out of the top of my head where 21 African-Americans were struck out of 21 strikes. And there were nine African-Americans left over. That's Lee versus Commissioner Alabama Department of Corrections. And the court in Lee said, yeah, wow, that looks pretty bad. You're striking, you used 21 strikes against all 21 African-Americans. But there are nine African-Americans left on the jury. And it said that in the prima facie case evaluation or the ultimate determination of discriminatory intent? That was how it looked at the prima facie case of determination. And this is what the district court Judge Proctor did here. And he just looked, and it's not definitive, but he said the fact that seven men and five women served here is like, and he analogized it to Lee. Let me pose a hypothetical to you, counsel. Sure. That suppose there was a 12-person jury, and 11 women served on this jury rather than five. But the prosecutor struck a juror who would have been the 12th juror. And the prosecutor's notes said, I'm striking this person because she is a woman, because I don't want an all-women jury. Would that be a Batson violation of constitutional magnitude? Absolutely. All right. So I don't understand why the Alabama makes much of the fact that five women served on this jury when 14 women were stricken. That's just one of the, as I was going to say, three factors. I'll move on to the others. That's a good idea. Smith, I suggest, notably in making his prima facie... One strike can support a Batson violation. That's true, Your Honor. Smith, in making his prima facie case, did not suggest that the DA's office had a significant discriminatory history against women. He did against African-Americans, but he did not against women. He also did not suggest that there was any reason why the state would want to strike women in this particular case or that there was some kind of significant sensitivity issue or any reason why it hurt the women. If you say that Mr. Smith was striking men, isn't the obvious inference that Mr. Smith thought that men would be harsher toward him and you thought that women would be more favorable to him if all of you were trying to get a gender clean jury for your purposes? Well, that could be a logical inference. What other logical inference could there possibly be? If you're saying he struck all the men... He didn't strike all men, but he did strike 11 men. Okay, well, you didn't strike... The prosecutor didn't strike all the women. He left one woman on with his peremptories. But sometimes numbers don't tell you anything. Sometimes numbers begin to tell you a pretty good story. Sure, but if you look, the problem in the district court was the comparators that were brought up with these four. And again, it's only four. It's not 14. It's four religious affiliation jurors. And the three comparators that my friend brought up in the district court were first, he brought up a woman, Mary Parham. And as the district court correctly found, you can't infer gender discrimination from lack of a strike of a woman. But second, John Hall, he explained himself. He was the youth YMCA football team coach for one season. Then he was moving on to be a basketball youth coach. So there was no inference or indication that he had any religious affiliation or susceptibility to the pleas that the defense counsel did, in fact, make. The defense counsel actually threatened the jury with hell if they didn't give this guy life without parole. Susceptibility to pleas for mercy granted in the Christian faith. And then that leaves us all with Mr. Johnson. So he left all of his religious beliefs at the door once he finished coaching at the Y and decided to go coach other youth. He didn't indicate that he had any religious beliefs. Did the women indicate that they had religious beliefs? The four women, yes, sir, they did. All of them? Or they just worked there? The four women, again, not 14-4, Sunday school leader, counselor of ministry, Sunday school teacher, church Red Cross volunteer, church kindergarten teacher, and Sunday school youth director. But you're talking about their jobs, not their religious beliefs. Right, but yes, their religious affiliation that made them sensitive to the mercy argument, which was coming and did come. How about the other comparators? That's Mr. Hall. That's Mr. Johnson. I thought you said it was Hall, no, Johnson? Yeah, Johnson. Okay. Who we have no idea who Mr. Johnson was. No, right, the one you just talked about was Hall? Hall was the YMCA football now basketball coach. Now you're moving on to the second one. Whatever. The first one was a woman, Mary Parham. And they said the failure to strike her was evidence of gender discrimination, when failing to strike a woman is really not evidence of gender discrimination. The second comparator was John Hall, the YMCA football team, now basketball team coach. The third was the ever elusive Mr. Johnson. What does the C stand for in YMCA? I understand that, but Christian. Yeah, so, I mean, he was affiliated with a religious organization just like the women were. Well, in a sense, but the prosecutor 30 years ago, I guess, didn't see it that way. He didn't. But anyway, back to Mr. Johnson, because he was discussed by my friend here. Smith has never shown, much less asserted, which juror was misidentified as Mr. Johnson. And it's not like this is the first time this issue has been before a court. I mean, you had the original proceedings where this was all litigated. The trial court found no prima facie case. Court of Criminal Appeals on appeal finds a prima facie case and a romance for a Jeb hearing. So then there's this whole 1997, it's a lengthy hearing. This, you know, the Mr. Johnson would be glaring in my eyes as to who is this? Why aren't you asking who this person is? There's no explanation, no effort to explain that. And still to this day, here we are in the 11th Circuit and there's Mr. Johnson here. And we don't know who he was. For all we know, he was the defense's first strike. We don't know his characteristics beyond what he said and we just don't know who he was. So those were the only three comparators. I take it you agree with Mr. Abrams that this list of jurors for the jury week beginning May 4th, 1992, with the two Mr. Johnson on it doesn't have any bearing on this. That's, that would be my understanding, Your Honor. I mean, just why not? They were on another jury or? There were multiple juries going on that week. And we know that from the voir dire because several of the women, for example, who were said that they couldn't serve on a criminal case. And there was a civil, there was a civil trial going on at the same time. Thank you. If there are no further questions, I'm happy to rest on my brief and ask this court to affirm the judgment of the district court. Well, I have one more. I have one more question. So with regards to talking about the prosecutor's personal history, with regards to certain types of strikes that are not issued here, how does that play into the whole equation? I think it plays into it as a factor. And, and I'm glad Your Honor reminded me of that point. The trial judge did make observations. He had made detailed notes. And he was the one who helped identify one of the jurors who was sleeping. And he referred to some of my notes that I observed her sleeping and being inattentive. So I think that's kind of an indication that the prosecutor and the judge had worked together before and had obviously been observing this jury. And one more point. The prosecutor had put the judge and the defense counsel on notice about one of the jurors and said, look, she's not. But the judge can't come up with his own reasons, can he? I mean, he's got to look at the prosecutor's reasons and determine whether or not the prosecutor's reasons are gender neutral. He can't come up with, he can't be the judge and the prosecutor and come up with his own reasons. I'm not aware of any case that says a judge can do that. No, no, that's not what I meant to say. And I think I said that wrongly. What I meant to say was if his notes are consistent with what the prosecutor is saying, the prosecutor saying this juror was inattentive, she appeared to be sleeping. And the trial court says, wow, look at my notes. Yeah, the same thing. I had written down the same thing. I noticed she was dozing off. But the judge in this case did come up with his own reasons, though, didn't he? He says, I know him. He wouldn't do this kind of thing. And he's an African-American prosecutor. So therefore, he would not engage in gender discrimination. That's not the role of the trial judge in making a Batson determination, is it? Judge's role is to look at the prosecutor's reason and determine whether or not they're gender-neutral reasons. That's correct. And we would contend that's exactly what happened here, Your Honor. All right. Thank you. Mr. Abrams, you've reserved some time. Yes, I did, Your Honor. Thank you. You may please record. First, Your Honor, with regard to the deficits, both Dr. Selican and Dr. King, as shown in the record, found deficits in what's called use of community resources. These are the skills for one to function in the community, being able to shop, get around, et cetera. Both experts found that deficit. Both experts, Selican and King, found deficits in self-direction. This is another one of the skills needed for independence, responsibility, starting completing tasks. The CIBAR test, which if you look back in the record, what it shows is you go and they ask questions of the brother and the mother saying, and they're very fact-specific. Is he able to, does he perform hygiene? Does he take showers? Does he do this? Does he do that? And then based on all this, they come up with checking the boxes and saying, here's what we find. And in fact, Dr. King found that there were deficits in what's called, the class called leisure skills. These are for, you know, being able to interact with others, being able to— Because Mr. Johnson said, yes, there were deficits in adaptive behavior, but the Alabama court said they were not significant. My point is, is that the significance comes in, it has to be more than one category. That's what Perkins is talking about. And in fact, Atkins itself talks about, you're right, significant limitations in adaptive skills, such as communication, self-care, and self-direction. In other words, you have to have more than one activity, more than one class is where you get significance. It's not that in that one class that you necessarily have to be very, very low. And in fact, Dr. King found that there were deficits in social skills. Can Alabama say, can the Alabama court say, there are deficits in adaptive skills, however, we find that this is what they are? I think one of them is interpersonal skills and those kinds of things. However, it's not significant based on what I see. It's not significant. Well, I think what the Alabama court said was that they agreed that there were significant deficits. I don't know if they used the word significant, but they did find the deficits in more than one area based on the testing. And this is where I think Mr. Johnson was incorrect. He said, oh, well, they didn't, none of the experts found it. And that's my point. The experts did find deficits in all these various areas and found them and based on the testing. It's only when that the Alabama court went and said, well, I'm going to go look at the transcript. That's where you get outside of the testing. Now, my opposing counsel has said about the Woodcock-Washburn test. That's what Dr. Sullivan gave. That's not an IQ test. And he did well on that test. And that shows that Smith wasn't malingering. He did well on some tests and didn't do well on others. But the key is, it's the IQ. And to Judge Martin's question about the Weschler test, the way this works, as I understand it, again, I'm not a statistician or a psychologist, but all of these tests are normed. And then they're normed again. And then they're normed again. And so when you're looking at an IQ of 72, it's not as if I got a 72 on a math test. What it is, is it's saying, I took a number of different tests. And then the experts all compare those to various norms. And then from all that, say, well, I fall into this category. And therefore, I'm going to assign a 72. And that's why sometimes it's not an averaging of those two numbers can get you below with that. But with regard to the point of that Mr. Smith worked for two years, I think that the fact is that he worked. It was a part-time job. He was unable to hold on to it. And the record shows that it was in 1987, which is more than four years before when the crime here occurred. The reality is, is that Mr. Smith, as the record shows, he had a difficult childhood. He had difficulties in terms of keeping a job. He was living at home. And I think the other thing that's facts, although this crime admittedly was horrific, this is the first contact Mr. Smith had with the criminal justice system. Unlike these other, in these cases that are discussed by the appellate court in Alabama, where Ferguson and Stallworth, where these people are career criminals and the court is saying, wait a minute, this is someone who knows how to plan. Smith was not that way. He had one prior, according to the report with regard to the mitigating circumstances, he apparently had an action for trespass where he had to pay a fine. Other than that, there were no prior arrests. And again, not to take away that this crime was not horrific. My point is, is that this situation was the first time Smith was involved. And second, I don't think Smith can be, as I said before, can be considered to have been planful when he. But this argument doesn't have any effect whatsoever on the issues in this case, does it? The argument that you're making now. About the fact that this was his first offense. I think it has. My point is, is what I'm drawing is a distinction between the Stallworth case and the Tharp case and the Ferguson case, which the state has pointed out saying, oh, look at these other cases where we go beyond just the tests to see who these people are and what they do. And in those cases, you're looking at people who are involved in a series of crimes over a number of years who, like, for example, Ferguson was one of them was a stonemason. These are all discussed in our briefs for a number of years. And that's not Smith. That's not what this situation is. So I believe that it's relevant to the issue of this Rule 32 court going beyond to look to these other factors. As far as the strikes and to Judge Jordan's question, the way I understand it, there is a, if you go back into the record, you'll see there's actually a box. There's some papers of the judges filled in where they put the jurors in those particular places. And then when two of the jurors were dismissed by agreement, they moved others in and put them in place for those. So when the strikes are being made, they're focused on that particular group and what they have. And the way the strikes work. So you're striking in the box, not striking across the entire veneer. Correct. And the way the strikes work in this case were they went right down the list. And for example, the state's first strike was 81, who was a black female. And Mr. Johnson said, oh, well, the defense's first strike. Well, the defense's first strike, it turned out, was a white female. Mrs. No. Again, the second strike by the state was Beatty, who was a white female. Third strike, Marler, a white female. Fourth strike, O'Lilty, a black female. Fifth strike, Patterson, a black female. Again, down the list, the state taking out all the women. Now, Judge Proctor said that we had a weak prima facie case. But part of that weakness was based on the final jury composition of saying that it was five and seven. And our position is that that does not, that is, while relevant, of course, as a fact, it's not an issue here because in this case, you're looking at 14 to 15 strikes and you're trying to understand what did this prosecutor do. And you have to look at the side-by-side analysis. That's why ultimately when we look at the Mr. Johnson, you have a finding by the district court that Mr. Johnson sat on the jury, whoever that was, and that he was a member of the board of his church. And that stands in stark contrast to the state saying, well, the reason I got rid of these four women was because they were volunteers at church. Again, you have Mr. Hall who was not struck, who was the volunteer at the YMCA. And you have Ms. Perry and Ms. Ramos who I mentioned in our, and the state has not discussed. So you have a whole series of strikes here where we do a side-by-side comparison. Given the 10 to 2 verdict here, the question of Batson is of extreme importance to this particular case. We would ask that the court find in favor of Mr. Smith on the Batson issue and on the intellectual disability question. Thank you. All right. Thank you, counsel. The court is adjourned. All rise.